UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

vs                                     Case No: 04-80408
                                     Honorable Victoria A. Roberts

CHARLES MADY,

     Defendant.

_____/

## OPINION AND ORDER

     Defendant Charles G. Mady ("Defendant") was charged in a Superseding

Information with two counts of embezzlement of commodity pool funds in excess of

$100.00, in violation of 7 U.S.C. §13(a)(1).   The Presentence Investigation Report

("PSIR") sets forth operative facts of Defendant's offenses.  Defendant has filed no

objections. The PSIR states that:

> 19.   Throughout the course of the offense, the defendant fraudulently
> represented to the investors that he was a successful commodities
> trader; fraudulently represented to the investors that their funds
> would be, and were being, used for investment in commodity
> futures, and that the investors could expect to receive certain and
> significant profits on their investments; and failed to disclose to the
> investors that he was consistently losing money in the commodities
> futures trading, and he was not as a rule generating profits for the
> investors.  The defendant also failed to disclose that he was using
> investor funds to repay principal and purported profits to previous
> investors, and to pay his own personal expenses which were totally
> unrelated to the commodity pool.
>
> 20.   MADY would often record his obligation to investors as a "loan" with
> a guaranteed rate of return.  During the offense the defendant
> would make oral misrepresentations and periodically provided
> many investors false "account statements", "fund statements", as
> well as other false and/or misleading documents.  All of these

1

documents falsely indicated that the investors' money was being successfully invested by the defendant.  This induced the investors to continue to give the defendant money.  Contrary to his misrepresentations, the defendant sustained net losses of over $4 million from his futures trading during the period of January 1999 through May 2002.

21.   According to the government, their investigation revealed that the defendant converted over $3 million of investor funds to his own use.  The defendant used these funds to purchase and maintain thoroughbred horses, over $350,000.00 in home improvements, and the purchase/lease of various luxury automobiles.  The defendant disputes the conversion of $3 million to his own use.

22.   The offense resulted in a total loss of $8,220,660.00 to 30 investors.  On November 6, 2003, the defendant agreed to the entry of a "Consent Order of Permanent Injunction and Other Equitable Relief and Civil Monetary Penalty" before the Honorable Victoria A. Roberts.  This consent order was the result of a civil suit brought against the defendant by the CFTC.  As part of the settlement a receiver was appointed.  As of June 7, 2004, the Receivership Estate had recovered $1,263,509.98 which was paid to the investors on a pro-rata share.

23.   During the period of March 2004 through June 2004 the defendant offered to trade options to another investor.  The defendant assured the investor that he would not lose any money as a result of the defendant's trading.  The defendant assured the investor that he was a professional options trader; had a trading strategy that caused him never to lose money on trades; held a 1.5 million interest in a hospital, and was the beneficiary of a multi-million dollar trust fund.  The defendant guaranteed the investor's funds by assigning an interest in the hospital.  Based on the defendant's assurances and fraudulent misrepresentations the investor gave the defendant access to his trading account.  By late June 2004, the defendant had lost $1.67 million.  He was only able to reimburse the investor $170,000.00 after writing numerous checks that were returned for non-sufficient funds.

24.   The total loss attributed to the defendant's relevant conduct is $9,890,660.00.

PSIR at pp. 7-8

Defendant pled guilty to both counts of the Superceding Information on February

2

26, 2006, pursuant to a Rule 11 plea agreement ("Rule 11").

The PSIR indicates that Defendant has  an offense level of 25 and a criminal history category of I.  The recommended guideline range is 57 to 71 months.  However, in the Rule 11, Defendant and the Government agreed that a range of 57-64 months is reasonable and appropriate.   Under rights reserved in the Rule 11, Defendant now requests a sentence at least five levels lower.  He argues both sentencing guideline factors as a basis for departure, as well as 18 U.S.C. §3553(a) factors, in arguing for a variance.

A sentencing hearing was held on October 25, 2006.  Post-hearing, both parties filed supplemental authority.

For the reasons stated below, the Court rejects all of Defendant's arguments, and will sentence him within the applicable guideline range.

## II.   DEFENDANT'S SENTENCING MEMORANDUM

Defendant asserts several grounds for departure/variance: 1) his significantly reduced mental capacity due to a gambling addiction; 2) his deportation status; 3) his extraordinary acceptance of responsibility; 4) his lack of malicious/criminal intent; 5) market forces which contributed to investor losses; 6) claims by Demetrious Athanasiou (also known as "James Athens") misrepresent circumstances of Athens' losses; 7) professional impact on Defendant and his wife; and 8) the totality of the circumstances.[1]

Pre-*Booker*,[2] the Sentencing Guidelines limited the types of factors a district

---

[1]Defendant makes another argument under seal.  That argument is addressed in a sealed Order filed this day.

[2]*United States v Booker,* 125 S.Ct. 738 (2005).

3

court could consider in fashioning an appropriate sentence and mandated the extent to which a factor had to be present to warrant departure.  *See United States v Crouse,* 145 F.3d 786, 789-790 (6th Cir. 1998).  *Booker*, however, rendered the Guidelines advisory, requiring only that courts consider the applicable guideline range and the statutory concerns set forth at 18 U.S.C. §3553(a) and impose a sentence that takes into account the purposes in the statute.  *Booker,* 125 S.Ct. at 757.  It is now within the district court's discretion to decide what issues to consider and the weight they should be given, subject to review for reasonableness.  *Id* at 765; *United States v Webb*, 403 F.3d 373, 383 (6th Cir. 2005).  Bearing this in mind, the Court turns to Defendant's specific arguments.

**A.   DIMINISHED MENTAL CAPACITY**

Defendant asks the Court to depart downward--or sentence him to the low end of the applicable guidelines-- because he suffers from diminished capacity as set forth in U.S.S.G.  §5K2.13.  In the opinion of Defendant's expert, Dr. Robert E. Hunter, Ph.D., Defendant's "cognitive distortion" as a "Pathological Gambler" is the diminished capacity that contributed substantially to his commission of the crimes to which he has pled guilty.

Diminished mental capacity is a recognized ground for downward departure under U.S.S.G. §5K2.13 "if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense."  The departure should be commensurate with the extent to which the reduced mental capacity contributed to the commission of the offense.  U.S.S.G. §5K2.13.  But, departure should

4

not be granted if:

> (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

*Id.*

"'Significantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." *Id* at Comment 1. Except when caused by use of drugs or intoxicants, the nature or cause of the disorder does not matter for purposes of determining whether it constitutes a significantly reduced mental capacity. *United States v Lewinson*, 988 F.2d 1005, 1006 (9th Cir. 1993). And, it is sufficient if diminished capacity is a contributing cause, rather than the sole cause. *United States v Cantu*, 12 F.3d 1506, 1515 (9th Cir. 1993); *United States v Glick,* 946 F.2d 335, 339 (9th Cir. 1991).[3]

Dr. Hunter was retained by the Defendant. Dr. Hunter examined Defendant on

---

[3]Under current U.S.S.G. §5H1.4, addiction to gambling has been added, along with drug and alcohol dependence, as a prohibited reason for downward departure. However, drug, alcohol or gambling dependency does not disqualify a Defendant for departure if reduced mental capacity was caused by another factor or caused the addiction. *See U.S. v Leandre*, 132 F.3d 796, 806 (D.C. Cir. 1998).

For this Defendant's sentencing purposes, the 2001 Sentencing Guidelines were used, since they are more favorable to him. This Manual does not list addiction to gambling as a prohibited ground for departure.

only one occasion, July 13, 2006.  Dr. Hunter based his diagnosis on the one meeting with Defendant, interviews with Defendant's family and unspecified documents pertaining to this case.  Dr. Hunter concluded that Defendant met 10 of 10 diagnostic criteria in the DSM-IV ("Diagnostic and Statistical Manual of Mental Disorders") used to identify a "Pathological Gambler."  A close review of the Diagnostic Criteria for Pathological Gambling, however, makes clear that the 10 criteria are to be used in assessing a person who gambles in the traditional sense, i.e., one who plays games of chance for money, particularly for high stakes.

Defendant advised the probation department that he was exposed to gambling at a young age because his father owned race horses.  He says that he began betting at the racetrack in his teens. And, since he graduated law school (in 1994), he has taken three trips per year to Las Vegas, Nevada where he spent approximately $10,000 per visit.

At the sentencing hearing, Dr. Hunter conceded that Defendant did not now fit the traditional definition of a gambler as that term is used in the DSM-IV.  He writes in his report that Defendant's "investment strategies at the time of his criminal charges were gambling responses rather than measured investor responses."  Dr. Hunter opines that Defendant's addiction contributed substantially to his actions in the charged offenses.  One factor Dr. Hunter seemed to regard as significant is Defendant's claim that he was driven by a desire to make his investors whole:

> He, like pathological gamblers everywhere, was [sic] attempted to 'hit the score' that would 'make everything good' (his words) for the people he had wronged. . . . Mr. Mady was driven not by the greed and avarice of the typical financial offender, but instead by a

6

> pronounced desire to right the wrongs and repair the damage done
> to his investors.

Def. Sentencing Memo, Exh. A at pp. 15-16.

Dr. Hunter further conceded that the DSM-IV, in its discussion of Pathological Gambling, addressed *action and behavior* rather than *thought.* But, Dr. Hunter reconciled his diagnosis of Defendant to the DSM-IV by testifying that  Defendant's thought processes closely approximated the dozens of traditional gamblers that Dr. Hunter treats daily.  He explained that Defendant's judgment was impaired; that he had the poor judgment of a compulsive gambler.

The DSM-IV - the diagnostic tool relied upon by Dr. Hunter - requires that the expert determine that the gambling behavior is not better accounted for by a Manic Episode, before making the definitive diagnosis of pathological gambler.  *See* DSM-IV, Diagnostic Criteria for 312.31 Pathological Gambling, Criteria B.

While Dr. Hunter concludes that Defendant does not suffer another psychological or psychiatric illness, nowhere in his report does Dr. Hunter rule out "Manic Episode." He merely states that Defendant does not suffer from any of the following:

-bi-polar disorder, historically referred to as manic depression,

-schizoaffective disorder or any other thought disorder other than cognitive distortion secondary to his diagnosis of pathological gambling.

-anti-social personality disorder (historically referred to as sociopathic personality), or

-any other Axis II personality disorder (illness of character or personality).

Def. Exh A at p.10

This oversight makes Dr. Hunter's diagnosis unreliable.  According to the DSM-

7

IV, a Manic Episode is a mood disorder which has several features, including a disregard for ethics:

> Ethical concerns may be disregarded even by those who are very conscientious (e.g., a stockbroker inappropriately sells without the client's knowledge or permission...)

> The criteria for a Manic Episode includes the presence of at least three or more

of the following symptoms, to a significant degree:

> (1)    inflated self-esteem or grandiosity

> (2)    decreased need for sleep (e.g., feels rested after only 3 hours of sleep)

> (3)    more talkative than usual or pressure to keep talking

> (4)    flight of ideas or subjective experience that thoughts are racing

> (5)    distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli)

> (6)    increase in goal-directed activity (either socially, at work or school or sexually) or psychomotor agitation

> (7)    excessive involvement in pleasurable activities that have a high potential for painful consequences (**e.g. ... foolish business investments**)

Clearly, one suffering a Manic Episode could appear to have symptoms similar to a Pathological Gambler. The DSM-IV mandates that the person rendering the Pathological Gambler diagnosis, consider the possibility of Manic Episode.

The Court does not mean to suggest that Defendant suffered from a Manic Episode, or any other disorder. The Court only suggests that Dr. Hunter's diagnosis of Pathological Gambling is highly suspect, inasmuch as Hunter:

> (1)    concedes the DSM-IV Pathological Gambling criteria addresses behavior and action not thought;

(2)     failed to rule out the differential diagnosis of Manic Episode; and

(3)     saw Defendant on only one occasion before diagnosing him as a
        Pathological Gambler.

From the diagnosis of Pathological Gambler Dr. Hunter concludes that Defendant

suffers from a significantly reduced mental capacity because of the cognitive distortion

typical to Pathological Gamblers.

While there is more than a preponderance of evidence to support a finding that

Defendant was a substantial risk taker -- with other people's money -- there is not a

preponderance of evidence to support a conclusion that Defendant's risk-taking resulted

from a cognitive distortion that so overtook his power to reason that he did not

understand -- or could not control -- his behavior.

Because Defendant fails to convince the Court that he suffered from diminished

capacity as that term is used in U.S.S.G. §5K2.13, the Court declines to downward

depart under that Guideline provision.

**B.     Deportation Status**

Defendant urges the Court to consider that his punishment will be exacerbated

by the consequences of his status as a deportable alien.  Defendant is a Canadian

citizen.  He will be subject to deportation at the conclusion of his sentence.  While

serving his sentence, he says that he: 1) will not be eligible for a Level 1 Bureau of

Prisons ("BOP") designation (for minimum security); 2) will be relocated to an area

outside of Michigan (and away from his family) where deportation proceedings can be

conducted; and 3) will not be released to a halfway house near the end of his sentence

like most other prisoners; he instead will be held until deported.

9

The Sixth Circuit has not addressed the issue.  However, a majority of courts (pre- and post- *Booker*) have held that, except in extraordinary cases, the collateral consequences cited by Defendant are an improper basis for downward departure.  *See United States v Restrepo*, 999 F.2d 640, 644 (2nd Cir. 1993)(finding that downward departure is not warranted due to the unavailability of preferred conditions of confinement, the possibility of an additional period of detention pending deportation, the effect of deportation as banishment from the United States, and separation from family); *United States v Nnanna*, 7 F.3d 420, 422 (5th Cir. 1993)(same); *United States v Mendoza-Lopez*, 7 F.3d 1483, 1487 (10th Cir. 1993)(same); *United States v Veloza*, 83 F.3d 380, 382 (11th Cir. 1996) (same); *United States v Macedo*, 406 F.3d 778, 794 (7th Cir. 2005) (Collateral consequences of deportable alien status do not meet requirement that conditions of confinement be "substantially more onerous" than the Guidelines contemplated in fixing punishment for a crime.); *Minh v United States*, 2006 W.L. 2444085, *2 n.3 (S.D. Ga 2006) ("Although a defendant's alienage might form the basis for downward departure in an extraordinary case, neither an alien's ineligibility for prison programs nor his deportability are in themselves sufficient grounds for downward departure.").

Some courts, however, hold that the collateral consequences of a defendant's deportation status may be an appropriate ground for downward departure when it results in "unusual or exceptional hardship in [the] conditions of confinement." *United States v Farouil*, 124 F.3d 838, 847 (7th Cir. 1997)(remanding for resentencing because the district court thought it lacked discretion to depart); *United States v Davoudi*, 172 F.3d 1130, 1134 (9th Cir. 1999)(agreeing that downward departure allowed because

10

defendant ineligible for home confinement at the end of his sentence, but affirming the
district court's refusal to do so because it found that this consequence did not take him
outside the heartland of cases).

And, some courts find that departure is warranted when a defendant's alien
status will substantially change the nature of the sentence.  In *United States v Smith*, 27
F.3d 649, 655 (D.C. Cir. 1994), the Court held, without deciding the extent to which it
applied to the case before it, that "downward departure may be appropriate where the
defendant's status as a deportable alien is likely to cause a fortuitous increase in the
severity of [a defendant's] sentence."  However, the Court further stated that a
departure on such a basis is only reasonable if the difference in severity is substantial,
the court has a high degree of confidence that the difference in severity will apply for a
substantial portion of the defendant's sentence, and the court is persuaded that greater
severity is undeserved.  *Id.*

The Court in *United States v Bakeas*, 987 F.Supp. 44 (D. Mass. 1997), followed
the reasoning of *Smith* and granted downward departure.  The *Bakeas* defendant's
guidelines allowed for a twelve month sentence.  The probation department
recommended a sentence of twelve months in a community treatment center.  However,
because aliens are ineligible to serve their time in community confinement or a
minimum security institution, defendant would have been required to serve his sentence
in a medium security prison.  The Court found the consequences of defendant's status
would significantly transform his guideline sentence:

> I find that the transformation of the nature of Bakeas' sentence from
> a period of community confinement to the same period of
> incarceration in a medium security 24-hour lockup makes this case

11

of first-offense embezzlement a significantly "unusual" one.

987 F.Supp. at 47.  Thus, citing *Smith* and other authority, the Court granted a

downward departure of three years probation, with ten months of home detention.  The

Court stated that it did so "to counteract the way in which the defendant's status would

otherwise prevent the imposition of an appropriate guidelines sentence."  987 F.Supp.

at 51.

Although some courts are more liberal in their consideration of a defendant's

deportation status, they all require an alien defendant to demonstrate that collateral

consequences are exceptional in nature or degree.  Defendant failed to make that

showing to an extent that warrants downward departure.  He will be confined under

circumstances typical of deportable aliens; none of the consequences he faces subjects

him to a *substantially* more severe punishment.  In fact, the BOP has a low level facility

at Allenwood which has an "Immigration Interaction" program that the Defendant could

utilize.

### C.      Extraordinary Acceptance of Responsibility

Defendant says that he was cooperative and accepted responsibility in the civil

suit brought against him by the Commodity Futures Trading Commission ("CFTC") by

giving extensive deposition testimony, entering into a Consent Judgment for the full

amount of the losses, agreeing to sell all of his assets for restitution, and (except as to

Jim Athens as discussed below) he never challenged the amount of losses or his

obligation.  This conduct, per Defendant, sets him apart from others charged with the

same type of crime.  In support, Defendant cites three cases which he regards as

analogous--*United States v Demonte*, 25 F.3d 343 (6th Cir. 1994), *United States v Kim*,

364 F.3d 1235 (11th Cir. 2004), and *United States v Lieberman*, 971 F.2d 989 (3rd Cir.

1992).

In *Demonte*, the Court affirmed the lower court's downward departure for

extraordinary cooperation where he confessed to unrelated crimes of which the

government was unaware and which subjected him to additional liability. The *Demonte*

Court reversed the lower court's downward departure for extraordinary restitution, since

he only did so after entering a plea agreement and he did it in accordance with the

district court's order that he liquidate his assets before sentencing. The Court further

expressed concern about the extent to which wealthy defendants will have an

advantage over defendants who are unable to quickly or completely make restitution.

Nevertheless, the Court did not foreclose the possibility that there may be

circumstances in which downward departure will be appropriate because of a

defendant's tender of restitution.

In *Kim*, defendants were husband and wife. They participated in a scheme with

others to defraud a federal food stamp program. After defendants were indicted, they

agreed to pay restitution before sentencing and they agreed to repay the full amount of

the fraud even though they were only responsible for two-thirds of the debt. Before

sentencing, they went to great lengths to raise the money (over $200,000) by liquidating

most of their assets and securing loans from family and friends. Because the Court

found their efforts extraordinary, the court reduced Mr. Kim's sentence from the

guideline range of 15-27 months to 5 years probation with six months of home

confinement, and it reduced Mrs. Kim's sentence from the guideline range of 6-12

months to 2 years probation with four months home confinement. The Government

13

appealed.

The *Kim* Court affirmed the lower court's decision.  It noted that courts consider a range of factors to decide whether restitution payments are extraordinary, including: 1) degree of voluntariness; 2) the efforts to which a defendant went to make restitution; 3) the percentage of funds restored; 4) the timing of the restitution; and 5) whether the defendant's motives demonstrate sincere remorse and acceptance of responsibility. 364 F.3d at 1244.  The Court found that each factor weighed in the defendants' favor, even though they did not make restitution until after they were indicted and it was pursuant to a plea agreement, because: 1) defendants only benefitted from two-thirds of the loss but agreed to pay the entire amount; 2) they raised the money from family and friends; 3) Mrs. Kim passed a lie detector test and only pled guilty to a misdemeanor to show her extreme remorse; 4) defendants made the first payment of $50,000 on the day they pled guilty and paid the balance before sentencing; and, 5) the district court's finding that they were sincerely remorsefully was not clearly erroneous.

In *Lieberman*, the Court affirmed the lower court's one-level downward departure because of defendant's acceptance of responsibility.  The Court held that it was not an abuse of discretion to find that defendant's acceptance fell outside the heartland of cases where he: 1) began to make restitution shortly after his embezzlement was uncovered; 2) agreed to pay $34,000 more than he owed; and 3) met with bank officials to explain how they could detect other improper transactions in the future.  This ruling was prior to the Sentencing Commission adding an additional one-level reduction under U.S.S.G. §3E1.1(b).

The Government disputes Defendant's claims regarding his cooperative spirit.

14

The Government says that Defendant harassed the attorney who represented the CFTC and the attorneys representing the court-appointed receiver who liquidated his assets by filing baseless civil suits and professional grievances against them.  The civil suits have now been dismissed; [4] all of the grievances were dismissed for lack of merit.

Additionally, the Government points out that Defendant waited until less than three weeks before trial to enter a guilty plea.  The Government says that this Defendant - unlike the cases he relied upon - did not make any unusual effort to either quickly accept criminal responsibility or otherwise aid the Government.

The Court is not persuaded that Defendant's acceptance of responsibility in the CFTC civil case is extraordinary.  In fact, Defendant's claimed remorse and acceptance for responsibility for his actions is belied by James Athens' claim (discussed more fully below) that Defendant made multiple misrepresentations, after entering the Consent Judgment.  Athens relied on these misrepresentations and allowed Defendant to make trades for him.  The result: in $1.6 million in losses.  The Defendant did this when he was enjoined from engaging in further trading activity.  If Athens' claims are true, Defendant's willingness to engage in substantially the same conduct underlying the Consent Judgment, particularly while under indictment in this case, runs counter to his claim of remorse and acceptance of responsibilty.

### D.    Circumstances of Offense and Collateral Consequences

Defendant asks the Court to weigh a number of factors regarding the circumstances of the offenses and certain consequences he and his family face.

---

[4]Defendant dismissed his last pending case by signing a Stipulated Order of Dismissal in *Mady v Athanasious*, Case No: 05-74832 on October 25, 2006.

### i.    Lack of Malicious/Criminal Intent

Defendant denies a fraudulent motive.  He contends that his actions are distinguishable from a traditional "Ponzi scheme," because he did not solicit or accept money for fake "investments."  Rather, in his sincere but misguided attempt to realize profits for himself and his "investors," he simply overestimated the likely success of his commodities investment strategy.  In fact, Defendant asserts that his lack of malicious/criminal intent is evidenced by his repeated attempts to borrow money to repay "investors."

The Court is not persuaded.  Defendant's claim is belied by the fact that he used significant portions of the money given to him for trading for personal expenditures.  Rule 11 at p.2; PSIR at ¶21.  Defendant's use of "investments" for such personal extravagances is grossly inconsistent with his claimed noble intentions.

### ii.    Market Forces

Defendant contends that the Court should consider that the amount of losses is inflated by fluctuations in the stock market after the tragedy of September 11, 2001 ("9/11").

It is true that the conduct for which Defendant pled in Count 1 occurred shortly after 9/11--October 12, 2001 through October 26, 2001.  However, Defendant's relevant conduct for similar activities dates back to October 1999 and continued through May 2002.  Though he denies it, Defendant also allegedly engaged in similar conduct in June 2004 while he was under indictment and on bond in this case.  Therefore, the effects of 9/11 only cover a narrow period of Defendant's admitted and alleged activities.

16

In any event, the fact that Defendant chose such a volatile medium for his scheme is a consequence of his actions, not a mitigating factor. Although 9/11 was an extraordinary and unexpected event, fluctuations in the stock market by myriad forces are commonplace and were a foreseeable risk.

### iii.    James Athens

In an apparent attempt to dissuade the Court from considering the allegations of Jim Athens as relevant conduct, Defendant contends that the losses suffered by Athens are distinguishable from losses claimed by other victims. Indeed, Defendant says that Athens was not a fraud victim at all. Defendant claims that Athens knew about the indictment but (essentially) assumed the risk and allowed Defendant to make trades for him because Defendant made some successful investments for him. Athens denies Defendant's claims and says that Defendant pledged a racehorse he no longer owned as security against losses. Defendant denies making this representation.

However, the Government attaches documents Defendant allegedly gave Athens which it says are fraudulent, and which falsely indicate that Defendant had a $1.5 million interest in a hospital and $1.67 million in a trust account. *See* Government Exhs. 4-7. In fact, at the time of his alleged misrepresentations, the Government says that Defendant had forfeited most of his assets pursuant to the Consent Judgment and still owed $7 million in restitution. In any event, the Government says that the applicable guideline range would not change even if Athens' allegations are disregarded.

Defendant presented no evidence at the time of hearing which establishes that the documents the Government references were not false and fraudulent. These documents are strong evidence that Defendant used the same type of manipulation to

17

dupe Athens as alleged in this case.  Even if Athens was aware that Defendant was indicted, it is not clear whether he was aware of the Consent Judgment.  It appears that Defendant created a false sense of security by manufacturing documents assuring Athens that he had substantial assets which exceeded Athens' investments.  Therefore, it appears that Defendant's conduct with Athens is relevant conduct, under U.S.S.G. §1B1.3, that the Court considers in fashioning Defendant's sentence.

### iv.    Job Loss

Defendant asks the Court to consider that he and his wife will be unable to work in their chosen professions.  Defendant is a lawyer and real estate broker.  His licenses for each profession are revoked as a result of this conviction.  Defendant's wife is a podiatrist in Michigan.  However, per Defendant, if she wishes to be with him after he completes his sentence and is deported to Canada, she will have to give up her practice because podiatry is not recognized in Canada.

Post-hearing, Defendant provided the Court with information to support his wife's contention that while she could perform certain general podiatry procedures in Canada, she would be unable to perform any surgical procedures in Canada.  Surgery represents 90% of her current practice.

While unfortunate, these job loss consequences are typical of persons convicted of crimes.  Further, Mrs. Mady fails to address what would prevent her from maintaining her practice in Michigan if she resided in Ontario.  By way of example,  Defendant's own father is a Canadian citizen, resides in Windsor, but has managed to run a successful real estate business in the Detroit area for a number of years.  The job losses Defendant and his wife may suffer do not warrant downward departure.

18

**v.     Lack of Treatment Options and Benefits**

Per Defendant, the BOP offers a treatment and rehabilitation program for prisoners suffering from alcohol and drug addictions.  Prisoners who complete the program are eligible for reductions in their sentence.  However, Defendant points out that there is no comparable program for persons with gambling addictions.  Therefore, he contends that the fact that he will not get the benefit of rehabilitative services or the opportunity for a reduction in his sentence is an additional mitigating factor for the Court to consider in sentencing him at the low end of the guidelines - or below the guidelines.

Dr. Hunter testified that there is a "common molecular identity for drugs, alcohol and gambling," and that "the treatment is very, very similar for all the addictions."  Dr. Hunter did also testify that there is significantly more "cognitive disturbance or distortion in the gambler than is present in one who suffers from drug or alcohol addiction," which cannot be addressed in the treatment programs designed for drug and alcohol addictions.  Dr. Hunter calls this distortion the "chase phenomena," and says that pathological gamblers, regardless of their innate intelligence or educational level, have a pronounced ability to believe that only further gambling (or risk taking) will ameliorate the problems caused by their continued gambling.

While the treatment programs within the BOP for someone with gambling addiction may be limited, it appears from Defendant's own expert that elements of the treatment programs in the BOP for other addictions could be of benefit to Defendant.  Further, it appears treatment programs may be quite limited outside the BOP as well, for someone fitting Defendant's profile.

Defendant is subject to deportation.  Once he is deported, he can no longer be

19

supervised by the Court.  Since protection of the public is a factor that the Court must take into account under 18 U.S.S.G. §3553(a) in fashioning a sentence for Defendant, this Court is inclined to exercise caution in sentencing Defendant.  Defendant has demonstrated that there is a need to incarcerate him to protect him from the public, as evidenced by his violation of the Consent Order entered by the Court on November 6, 2003.  The Order prohibited Defendant from engaging in the activities that got him in trouble with the CFTC.  Despite this Order, Defendant offered to trade options for Mr. Athens, fraudulently represented his assets, and lost over 1.6 million of Mr. Athen's funds.  Defendant's bond was revoked because of this conduct, because he presented a danger to the community.  The revocation of bond decision was upheld by the Sixth Circuit.

The Court will sentence Defendant to a term in prison where at least some of his so-called addictive qualities can be addressed by the BOP for as long as possible. Once Defendant is released and deported, this Court will be powerless to supervise any treatment program Defendant might be inclined to get himself into.

### E.    Totality of Circumstances

Defendant asserts that the Court has authority to rely upon a combination of factors to grant a downward departure.  Defendant is correct.  Even if certain factors do not individually warrant downward departure, the Court must "consider the particular factors of [a] case as a whole, and any combination thereof, in determining whether there were sufficient extraordinary factors to take [a defendant's] case out of the 'heartland' of . . . cases."  *United States v Coleman,* 188 F.3d 354, 361 (6th Cir 1999).  In its analysis, the *Coleman* court made it clear that factors that may be insufficient when

20

considered individually, may nonetheless justify a departure when considered in conjunction with other factors.

The totality of circumstances here do not warrant downward departure. None of the grounds asserted individually or collectively is sufficiently extraordinary to take Defendant out of the heartland of cases.

### F.     18 U.S.S.G. §3553(a) Factors

The Court is cognizant that under §3553(a), it is to fashion a sentence that is sufficient - but not greater than necessary - to comply with the need for the sentence:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. §3553(a)(2).

The Court is to consider the nature and circumstances of the offense and the history and characteristics of the defendant 18 U.S.C. §3553(a)(1).

The Court has addressed these considerations above.

The Court notes, too, that under the Rule 11 Defendant entered into, the complaint the Government filed against him for the Athens conduct was dismissed. So were a host of other charges that were in the Second Superceding Indictment, including mail fraud, wire fraud and money laundering. The Defendant agreed that these charges and relevant conduct would be considered by the Court in fashioning his sentence. With the dismissal of these charges, Defendant received a substantial break on the

21

sentencing guideline range that the Court otherwise would need to take into account.

For example, Defendant's actions against Mr. Athens are taken into account for restitution purposes only.  Otherwise, Defendant would have been looking at a 3-level enhancement under U.S.S.G. § 2J1.7 for commission of an offense while on federal release.  This enhancement alone -- without regard to the penalties for other dismissed charges -- would have placed Defendant in a guideline range of 78-97 months, part of which would necessarily have to be served consecutive to any other sentence imposed upon him.

Defendant engaged in serious, misguided conduct against multiple victims over a 2 1/2 year period, and resumed his manipulative conduct while under indictment and injunction, indicating an utter disrespect for the law.   The conduct was demonstrated by a lawyer licensed by the State of Michigan, sworn to uphold the law.  Defendant may have placed his victims in financial ruin.  He lost over 9.8 million dollars of monies not his own.  Much of his victims' losses was his gain: he reaped it in cash, vehicles, horses, home improvements and credit card purchases.

Based on the Guidelines and the §3553(a) factors, the Court finds that a sentence within the applicable guideline range is one that would be sufficient for this Defendant, and certainly would not be greater than necessary, to punish him for the crimes he pled guilty to and for his related relevant conduct.

**IT IS SO ORDERED**.

  /s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  November 1, 2006

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
November 1, 2006.

s/Linda Vertriest
Deputy Clerk